United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

MANUEL MADRIL,

               Petitioner,

  vs.

K. HARRINGTON, Warden,

               Respondent.

_____/

No. C 10-1771 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY**

      This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the writ should not be granted.  Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court.  Petitioner responded with a traverse.  For the reasons set out below, the petition is denied.

## BACKGROUND

      On January 29, 2007, a jury found petitioner guilty in count one, of first-degree murder, *see* Cal. Penal Code § 187; in counts two and three, of second degree robbery, *see* Cal. Penal Code §§ 211, 212.5(c); and, in count 4, of vehicle theft, *see* Cal. Veh. Code, § 10851(a).  Respondent's Exhibit ("Resp. Exh.") A4 at 946-47, 949-50, 953.  For counts two through four the jury found true the allegation that petitioner committed the offense for the benefit of, or in association with a criminal street gang, *see* Cal. Penal Code § 186.22(b)(1)(C).  Resp. Exh. A4 at 952, 954.  On April 19, 2007, the court sentenced petitioner to a total term of 38 years to life in prison, consisting of an indeterminate term of 25 years to life consecutive to a determinate term of 13 years.  Resp. Exh. C at 2.  For the

determinate term the court imposed the midterm of three years on count two, a concurrent

term of ten years for the gang enhancement, stayed a total term of thirteen years for count

three, and imposed a concurrent term of five years on count four. *Id.* at 24.  On November

14, 2008, the California Court of Appeal affirmed the judgment with a modification to stay

the sentence imposed on count four.  *Id.* at 31.  A petition for review was summarily denied

by the California Supreme Court on February 18, 2009.  Resp. Exh. G.  Petitioner did not

seek further review in the state courts.

The facts, as described by the California Court of Appeal, are as follows:

Andrew Satterwhite, who was 17 years old in October 2005, testified under a grant of immunity that on the evening of October 8, 2005, he and Robert Conrad walked through Boggini Park on their way home from a friend's house.  It was dark, but they could see a group of 10 to 20 men by the picnic tables in the park.  One of the men asked them, "'Why are you coming up on us?'"  Satterwhite responded, "'It's not like that.'"  The man asked, "'What do you claim?'"  Satterwhite thought that the man was asking him if he was in a gang, so he responded that he didn't claim anything.  The group of men surrounded Satterwhite and Conrad and one of the men shook Satterwhite's hand and said "'It's Norte.'"  The man then told Satterwhite and Conrad to empty their pockets and said "'It's Capitol Park.'"

A man hit Satterwhite in the left eye and in the mouth and broke a 40-ounce beer bottle over his head.  His head started bleeding and he fell to the ground.  While reaching towards his back waistband, the man said, "'Don't make me get the gun.'"  The man took off the Larry Bird Celtics jersey, the white T-shirt, and the white Nike shoes that Satterwhite was wearing.  The group of men started running away so Satterwhite and Conrad ran in the opposite direction.  Although Satterwhite saw a police car nearby, he did not run towards it because he wanted to go home.  His parents reported the incident to the police.

Satterwhite went to the Regional Medical Center where he received six staples in his head and stitches on his right arm for cuts from the broken beer bottle.  While he was at the hospital, he told officers that a man who hit him had "San Jo" tattooed on his neck.  Officers brought Satterwhite's shoes and Conrad's Raiders jersey to Satterwhite and he identified them.  Officers also showed him two men.  Satterwhite thought that one of the men looked like the man who hit him with the beer bottle and then took his jersey.  He was asked to, but could not, identify a man who at the time was lying on a hospital stretcher.

Conrad, who was 17 years old at the time of trial, testified that on October 8, 2005, while he and Satterwhite were walking through Boggini Park around 9:30 p.m. on their way home from a friend's house, they were stopped by a group of about 20 men.  It was dark but at first the group seemed to be friendly and somebody shook Satterwhite's hand.  The men then said, "'What's up,'" and had Conrad and Satterwhite sit down at a

United States District Court

For the Northern District of California

picnic table because the men did not know them.  Conrad's black New York Yankees baseball cap was hit off his head and the men told Conrad and Satterwhite to empty their pockets.  Conrad took a brush, a washcloth, and some papers and keys from his pockets.

The men told Satterwhite to take off his jersey.  When Satterwhite did not comply, he was hit in the head with a bottle, thrown to the ground, and his jersey and shoes were taken off him.  Somebody hit Conrad on the back of his head, slamming it onto the picnic table.  Because of all of this, Conrad decided to do whatever the men asked him to do.  He removed his Porter Raiders jersey.  Somebody pulled his T-shirt, chain and "R" pendant off him, so he removed his earrings.  When the group of men left them, Conrad and Satterwhite ran out of the park.  They went to a friend's house and discussed the incident before going home.  Conrad did not report the incident to the police.

San Jose Police officers Stanley Gaspar and Melinda O'Neil were dispatched to Boggini Park around 9:23 p.m. on October 8, 2005, due to a 911 report that there were 20 to 30 people in the park, that there might be [a] fight, and that there were threats of a shooting.  When the officers arrived around 9:26 p.m., Gaspar saw people running through the park and vehicles driving away in all directions, some with their headlights off.  Gaspar and other officers contacted a group of six to eight people at the park and pat searched them for weapons.  While O'Neil was assisting Gaspar, she was notified around 9:35 p.m.,that there was a fatal accident involving a van at Quimby and Tully Roads.  O'Neill left for the accident scene, where she interviewed witnesses.  After Gaspar ensured himself that nobody in the park had a weapon and that nobody was hurt, he also responded to the accident scene.  Officer Catherine Foley, who had been dispatched to Boggini Park at 9:27 p.m., left the park for the accident scene around the same time as Officer Gaspar.

Officers Kendra Spath, James Gonzalez and Michael Clark were dispatched to Boggini Park at 9:31 p.m. on October 8, 2005.  While Officers Spath and Gonzalez were eastbound on Quimby Road, a blue minivan sped westbound past them with its headlights off.  The dispatcher broadcast that a vehicle matching the description of the minivan had just been stolen.  Spath reported that she had seen the minivan traveling westbound on Quimby Road, but she and Gonzalez did not attempt to follow the minivan.  Before they arrived at Boggini Park, Spath and Gonzalez were redirected to an injury accident at Tully and Alvin, so they turned around and headed westbound on Quimby.  When they arrived at the intersection of Quimby and Tully, the blue minivan they had seen earlier was wrapped around a signal pole on the west side of the intersection. Spath reported the accident.

. . .

On the evening of October 8, 2005, Rigoberto Cardenas drove his blue Ford minivan to his sister-in-law's house on Castleton Drive near Quimby Road in San Jose.  He parked in the driveway and left his keys in the ignition and the engine running when he went inside.  The minivan was gone within a few minutes and he had not given anyone permission to take it. The theft was reported to 911.  About 30 minutes later the police notified Cardenas that they had found the minivan.  They called again

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

around 2:00 or 3:00 a.m. the next day, at which time Cardenas went to the intersection of Tully and Quimby Roads where he found the minivan "smashed." Inside the minivan were several items that did not belong to Cardenas.

Around 9:30 p.m. on October 8, 2005, Quyen Tiet witnessed a collision at the intersection of Tully and Quimby Roads. Tiet was on Tully Road about one-half block from the intersection when a minivan sped past him. The minivan accelerated towards the intersection as the stoplight was turning red, entered the intersection on the red light, and hit the driver's side of a car. Tiet thought he saw four people get out of the minivan. He called 911.

Antonio Gomez and Liliana Baez were on Tully Road slowing down for the stoplight at Quimby Road when they witnessed the collision. When the light turned green for Quimby Road, a red Honda Civic started into the intersection. A minivan with its headlights off sped past Gomez and Baez, entered the intersection on the red light, hit the driver's side of the Honda, and then hit a pole. The Honda spun and came to rest between 80 and 110 feet away. Gomez and Baez saw two men get out of the driver's side of the minivan and run towards a shopping center. Gomez pulled over, got out of his car, and yelled at the men to stop. The two men stopped for a moment then continued on. Gomez and Baez saw a third man get out of the passenger side of the minivan. Gomez was able to stop the third man, who collapsed, and Gomez dragged the man over to the sidewalk. Gomez then checked on the two occupants of the Honda. He got no response from the woman driver; the male passenger drifted in and out of consciousness. Baez identified photos of Salinas and Joseph Vargas as two of the men who got out of the minivan after the collision. Gomez identified a photo of Vargas as the man he stopped after he got out of the passenger side of the minivan, and a photo of Salinas as one of the two men who got out of the driver's side of the minivan and ran away.

. . .

Officer Foley prepared the accident report for the collision. Myra Aguirre was identified as the deceased driver of the Honda and Hugo Garcia was identified as the injured passenger. Aguirre died instantly as a result of blunt impact to her head and torso which caused both her brain stem and her aorta to sever. Aguirre also sustained fractures of her ribs, left arm bone, both leg bones, and skull, and abrasions throughout her body. Garcia was taken from the scene of the collision in an ambulance. He had lacerations above both eyes and on his right leg.

Two bags of items were taken from the minivan to the Regional Medical Center and shown to Satterwhite. Satterwhite identified his shoes and Conrad's jersey. He was not able to identify the black Nike shoes, a black T-shirt with "408" written in red, or a black hat. Five white T-shirts and a New York Yankees hat were found on the front passenger floorboard of the minivan on October 11, 2005, after the minivan was taken to the police storage lot.

Officer Kevin Cassidy testified as a collision reconstruction expert that the minivan was approximately 392 feet from the intersection when the signal turned red, and that he did not find any evidence that the driver of the

4

United States District Court

For the Northern District of California

minivan applied the brakes prior to entering the intersection.  The minivan struck the Honda before the Honda was halfway through the intersection.  At the time of collision, the Honda was traveling about 18 miles per hour and the minivan was traveling about 58 miles per hour.

. . .

Around 1:30 a.m. on October 9, 2005, officers were dispatched to the crime scene at Boggini Park.  On or around a picnic table in the middle of the park they found a broken glass beer bottle, some blood, a pair of white Nike shoes, a pair of red knit gloves, a key with a blue coil, a lighter, a white wash cloth, a $5 bill, and some jewelry.  The jewelry consisted of two earrings, a chain necklace, and an "R" pendant.

Madril's family took him to Valley Medical Center on the night of October 8, 2005.  Lisa Delatorre, Madril's sister, heard from family members that Madril might have been in a car accident that night and saw that Madril had bruises on his leg and head, and that his tongue was cut and swollen.  Lisa told her husband Ricardo that Madril might have been in a car accident.  When Ricardo later learned that the woman who was killed in a car accident that night was one of his niece's friends, he called the police.  Ricardo told the police that Madril had been in the hospital due to injuries he received on the night of October 8, 2005, and that the injuries might have been caused by the car accident that occurred on Tully Road.  Lisa told the police that Madril told her that he had been in a car accident on Tully Road and that he had fled from the accident because he had been in a stolen car.  Lisa also said that Madril was flashing what she believed were gang signs while he was in the hospital waiting area, and that it upset her.

Madril and Rachel Acosta, his mother, stayed overnight at her nephew's house after Madril was released from the hospital.  Although Acosta asked Madril how he was injured, Madril did not respond.  The next day, Madril wrote Acosta a note asking her to take him to the home of his girlfriend Christina Balandra in Tracy.  Acosta took him there.  Madril was arrested at Balandra's home on October 13, 2005.  At the time, Madril was wearing a red T-shirt.  An admitted Norteño gang member, Madril has "X4" tattooed in red on one of his fingers.  He also has "ESSJ," standing for East Side San Jose, "Norte," and "408" within a Huelga Bird tattooed on his left forearm.

On the night of October 8, 2005, Kristopher Bal heard about the incident in which Satterwhite's jersey was stolen.  About an hour after learning about the incident, Bal called the phone number of his friend Jorge Trejo's cell phone.  Trejo was a Norteño gang member.  Somebody Bal did not recognize answered the phone.  A few minutes after their conversation, a Black man named Timothy brought Bal a bloody white Larry Bird Celtic's jersey, Trejo's cell phone, and the jacket Bal had loaned to Trejo earlier that night.  The man said that he had found the items in the park, and Trejo later told Bal that he had been in Boggini Park.  Bal identified the black Nike shoes taken from the minivan on October 8, 2005, as belonging to his friend Artie, and the black hat with the red Huelga bird as the hat that he had loaned to Trejo along with his jacket.

. . .

5

United States District Court

For the Northern District of California

Vargas, who was 17 years old in October 2005 and "claimed" Norteño, testified pursuant to a plea agreement that he was at Boggini Park with 15 to 20 other people on the night of October 8, 2005.  It was dark, and he drank malt liquor, smoked marijuana, and talked with others in the group. Salinas and Madril were part of the group.  After about 15 or 20 minutes, around six teenagers came up to the group and asked for cigarettes. Members of Vargas's group asked the teenagers where they were from and if they "claimed ."  The teenagers said that they do not claim and then everybody shook hands.  They were leaving when Salinas, while putting his right hand behind his back as though he was going to pull out a gun, told the teenagers to sit down on a picnic bench or they would get shot. Salinas also yelled, "'Capitol Park.'"  The teenagers sat down.

The men in Vargas's group told the teenagers to empty their pockets and to put the items on the picnic table.  Salinas looked through the items and slapped each of the teenagers on the head.  He hit one of the teenagers on the head with a 40-ounce beer bottle, grabbed him, threw him on the ground, and took his jersey.  Madril went through the wallets on the table, then hit and kicked a different teenager and took off his shirt.  Vargas watched but did not intervene.  Salinas told Vargas to pick up "the pile" and then the group ran off.  Vargas picked up the shirts and jerseys that were on the ground and followed Salinas, Madril, and a teenaged member of his group.  About one block from the park, the four of them stopped and Salinas told Vargas to call his friend to come pick them up.  Vargas tried calling his friend while they continued walking.  When they saw an empty van parked with its engine running, Salinas told them to wait and then ran to the van, jumped in, and drove it back to them.  Vargas jumped into the front passenger seat of the van with the items he had grabbed at the park and Madril and the teenager jumped into the back.

Salinas sped off and turned onto Quimby Road without stopping at stop signs.  Vargas told Salinas to slow down but Salinas told him to shut up. Salinas sped through a red light at White Road.  Vargas saw two patrol cars heading in the opposite direction, and Madril said that "cop cars" were there.  Salinas said, "'I got it,'" drove faster, and turned onto Capitol Expressway.  He continued speeding and turned onto Tully Road, running another red light.  He continued speeding on Tully Road so Vargas put his seat belt on because he thought they were going to run into something. Vargas saw a red light at an intersection ahead of them but did not feel Salinas step on the brakes or swerve.  The van hit a red car and then hit a pole.  Vargas heard doors open but he did not see where Salinas, Madril, or the teenager went.  Vargas climbed out a window because his door was jammed, and then he collapsed and crawled to the sidewalk. The police and paramedics came and he was taken to the hospital by ambulance.

An officer took Vargas into custody at the Regional Medical Center and transported him to Juvenile Hall.  The officer also collected Vargas's clothes and booked them into evidence.  Blood samples taken from Vargas around 11:15 p.m. on the night of the incident tested negative for alcohol, but the samples were not tested for marijuana.  Madril's blood was found on the passenger-side airbag and the passenger seat armrest in the minivan.  Madril and Salinas were possible contributors of DNA found on the driver's side airbag and Salinas and Vargas were possible contributors of DNA found on the steering wheel.

**United States District Court**
For the Northern District of California

**The Gang Evidence**

San Jose Police Detective Christopher Dominguez testified as an expert in the operation, activities, and membership of Hispanic criminal street gangs that, in San Jose, gang members predominately align with Norteño gangs. Currently, there are around 40 different Norteño street gangs in San Jose, organized around the various geographic areas of the city. Members of the different Norteño gangs will often associate or "hang out" with each other. Norteños identify with the color red and the number 14. They act out against Sureño gang members, who identify with the color blue and the number 13, as well as against people who are not gang-affiliated. Norteños will steal somebody's clothing, such as a shirt or cap, as an act of intimidation or humiliation. When an individual Norteño gang member commits an assault or robbery, other gang members present are expected to support or assist in whatever way necessary, including helping the individual get away afterwards.

San Jose Police Sergeant Shawny Williams testified as an expert in the operation, membership, and criminal activities of Hispanic street gangs that El Hoya Palmas is a San Jose Norteño gang. Norteño gang members identify with the color red and the number 14. The black T-shirt with the number "408" in red and the black hat with a red Huelga Bird found in the minivan are consistent with the types of clothing that Norteño gang members wear. The Huelga Bird is associated with Norteño gangs as well as with the United Farm Workers. Norteño gang members view people wearing clothing consistent with Norteño gangs but denying Norteño gang membership as disrespectful and would take action against them. If a gang member took the clothing off such a person it would enhance the gang member's reputation within the gang.

Detective Dominguez testified that the El Hoya Palmas gang had approximately 45 members on the east side of San Jose in 2005. One of the primary activities of the gang was the commission of crimes listed in section 186.22, subdivision (e). In Detective Dominguez's opinion, based on Salinas's tattoos and his police contacts, Salinas is a member of El Hoya Palmas. East Side San Jose is an ongoing Norteño criminal street gang with approximately 300 members. One of its primary activities has been the commission of crimes identified in section 186.22, subdivision (e). In Detective Dominguez's opinion, based on Madril's tattoos and admissions, Madril is associated with East Side San Jose. Also in Detective Dominguez's opinion, the theft of Satterwhite's and Conrad's clothing and property and the physical force used against them was done in association with other gang members and was for the benefit of a gang.

Resp. Exh. C at 3-14 (footnotes omitted).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

7

United States District Court

For the Northern District of California

1  Supreme Court of the United States; or (2) resulted in a decision that was based on an

2  unreasonable determination of the facts in light of the evidence presented in the State court

3  proceeding." 28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

4  mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09

5  (2000), while the second prong applies to decisions based on factual determinations, *See*

6  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

7      A state court decision is "contrary to" Supreme Court authority, that is, falls under the

8  first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

9  reached by [the Supreme] Court on a question of law or if the state court decides a case

10 differently than [the Supreme] Court has on a set of materially indistinguishable facts."

11 *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application

12 of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly

13 identifies the governing legal principle from the Supreme Court's decisions but

14 "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The

15 federal court on habeas review may not issue the writ "simply because that court concludes

16 in its independent judgment that the relevant state-court decision applied clearly

17 established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must

18 be "objectively unreasonable" to support granting the writ. *Id.* at 409.

19     Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

20 determination will not be overturned on factual grounds unless objectively unreasonable in

21 light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at

22 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

23     When there is no reasoned opinion from the highest state court to consider the

24 petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*,

25 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.

26 2000).  However, when presented with a state court decision that is unaccompanied by a

27 rationale for its conclusions, a federal court must conduct an independent review of the

28 record to determine whether the state-court decision is objectively unreasonable. *See*

8

United States District Court
For the Northern District of California

*Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  This review is not a "de novo review of the constitutional issue;" rather, it is the only way a federal court can determine whether a state-court decision is objectively unreasonable where the state court is silent.  *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  "[W]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

**DISCUSSION**

As grounds for federal habeas relief, petitioner asserts that: (1) his due process rights were violated by the trial court's refusal to give an instruction on theft as a lesser included offense of robbery; (2) his due process and confrontation rights were violated by the trial court's giving CALJIC 2.11.5, instructing the jury not to consider why a cooperating witness was not being prosecuted; (3) there was insufficient evidence to support the criminal street gang enhancement; and (4) that the felony-murder rule violated his right to due process and resulted in cruel and unusual punishment.

**I.    Instructional Error**

a.    <u>Lesser Included Offense</u>

 Petitioner claims that his due process rights were violated by the trial court's failure to instruct the jury on petty theft as a lesser-included offense of robbery.  Hab. Pet. at 6(a).  At the instruction conference, Madril joined in his co-defendant Salinas's request that the court instruct the jury on petty theft as a lesser included offense of the robberies charged in counts two and three.  Resp. Exh. B10 at 1724-31.  The trial court expressed an inclination to err on the side of caution by giving the instruction, but had difficulty finding enough evidence to justify doing so.  *Id.* at 1725-29.  Based on its recollection of the evidence at trial, and after hearing the arguments and comments of the parties, the court concluded that there was not enough evidence to support giving a lesser included offense instruction as to petty theft on counts two or three.  *Id.* at 1731.

On direct appeal, Madril argued that there was enough evidence to suggest that

1    there was not a robbery, but a gang assault on other gang members followed by the theft of

2    some t-shirts and sneakers.  Resp. Exh. C at 15-16.  As set forth in the opinion of the

3    California Court of Appeal, the evidence established the following facts:

> The record in this case shows that Satterwhite and Conrad testified that
> they were assaulted and threatened after they failed to obey a demand
> that they empty their pockets.  Satterwhite testified that his jersey was
> taken from him after he was hit over the head with a beer bottle and
> thrown to the ground.  Conrad testified that he took off his own jersey
> after seeing what happened to Satterwhite.  Vargas testified that
> Satterwhite and Conrad were told to empty their pockets after defendants
> threatened them, and that Satterwhite was told to take off his jersey after
> being hit over the head with a beer bottle and being thrown to the ground.
> Satterwhite and Conrad testified that the group of men from the park left
> the park before they did.  Vargas testified that Salinas told him to grab
> "the pile" before the group fled from the park, and that he just grabbed the
> items that were on the ground and he left the items that were on the
> table.

Resp. Exh. C at 17.

        The appellate court acknowledged that theft is a lesser included offense of robbery,

which includes the additional element of force or fear.  *Id.* at 16.  However, the court made

it clear that it is not error to refuse a defendant's requested instruction on a lesser included

offense when the defendant relies on speculation and there is no substantial evidence to

support such an instruction.  *Id.* at 16-17.  Based on its review of the record, the California

Court of Appeal determined that the items were taken from the victims by force or fear, and

that there was no evidence that the offenses were less than what was charged.  Resp. Exh.

C at 16-17.  Because the record clearly established that the offenses constituted robbery

and not theft, there was no due process violation.  *Id.* at 17.

         A defendant is entitled to an instruction on a lesser-included offense if the law and

evidence satisfy a two-part test.  *See United States v. Arnt*, 474 F.3d 1159, 1163 (9th Cir.

2007).  Under the first prong, "the elements of the lesser offense [must be] a subset of the

elements of the charged offense," *Id. quoting Schmuck v. United States*, 489 U.S. 705, 716

(1989).  The second prong of the test is satisfied if "the evidence would permit a jury

rationally to find [the defendant] guilty of the lesser offense and acquit [him] of the greater."

*Id. quoting Keeble v. United States*, 412 U.S. 205, 208 (1973).

10

United States District Court

For the Northern District of California

1    Under California law, theft is a lesser included offense of robbery, the difference

2 being that robbery includes the added element of force or fear.  *See People v. Burns*, 172

3 Cal. App. 4th 1251, 1259 (2009).  Therefore the only issue before the court is whether the

4 evidence allowed the jury rationally to find petitioner guilty of the lesser offense while

5 acquitting him of the greater.  The only argument offered by petitioner to support a finding

6 that the offenses were anything less than robbery is that Vargas did not take all of the items

7 from the park and Satterwhite's jersey was voluntarily returned.  Traverse at 4.  This

8 argument lacks merit.  The jury could have inferred that Vargas unintentionally left some of

9 the items behind, and that Satterwhite's jersey was recovered from the wreckage and not

10 voluntarily returned.  This evidence is insufficient to require giving an instruction on the

11 lesser included offense of theft.  Given the substantial evidence presented at trial that the

12 items were taken by force and fear, a rational jury would not have been able to convict

13 petitioner of theft and acquit him of robbery.  Accordingly, the trial court did not err in finding

14 that there was not enough evidence to justify giving a lesser included offense on petty theft.

15

16    b.    CALJIC 2.11.5

17    Petitioner claims that the trial court violated his constitutional rights by giving CALJIC

18 2.11.5, "Unjoined Perpetrators of Same Crime."  Hab. Pet. 6(b).

19 The California Court of Appeal set forth the following facts underlying petitioner's

20 claim:

21        Vargas testified that he was charged with murder, two counts of robbery,
           and vehicle theft in connection with the incidents at issue here and that,
22        pursuant to a plea agreement involving his testimony at defendants' trial,
           he admitted the two counts of robbery and the remaining charges were
23        dismissed.  Vargas further testified that he and a teenager who had been
           in the park during defendants' robberies were also in the minivan with
24        defendants at the time Salinas drove through the red light and hit the
           Honda.  Other witnesses testified that they saw between two and four
25        people get out of the minivan after it hit the Honda.

26 Resp. Exh. C at 19.

27    At the jury instruction conference, the court stated, without objection from either

28 party, that it would give CALJIC 2.11.5 as modified.  Resp. Exh. B10 at 1712.  At the close

United States District Court

For the Northern District of California

of trial, the court instructed the jury as follows:

> There has been evidence in this case indicating that a person other than a defendant was or may have been involved in the crime for which that defendant is on trial.  There may be many reasons why that person is not here on trial.  Therefore do not speculate or guess as to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted.  Your duty is to decide whether the people have proved the guilt of each defendants (sic) on trial.

Resp. Exh. A 4 at 843, B10 at 1748-49.

On direct appeal petitioner argued that the trial court erred in giving CALJIC 2.11.5 because it prevented him from impeaching Vargas's credibility for testifying against him pursuant to a favorable plea agreement.  Resp. Exh. C at 19-20; Hab. Pet. 6(b)-(c).  The Court of Appeal noted that it is indeed a mistake to give the instruction where a person who might have been prosecuted for the crime has testified at trial.  *Id.* at 20.  Nevertheless, the court emphasized that the mistake is not error so long as the instruction is given with the full panoply of witness credibility and accomplice instructions.  *Id.*  The court concluded that the instructions as a whole correctly instructed the jurors regarding Vargas's credibility by making them aware that, in exchange for his testimony, he had entered into an agreement to plead guilty to the same charges that were brought against the defendant.  *Id.* at 21. Furthermore, there was testimony from a fourth person who was present during the offense to whom the instruction could apply.  *Id.*  Under these circumstances the Court of Appeal concluded that the trial court did not err in giving the instruction.  *Id.*

The formulation of jury instructions is a question of state law and is not cognizable in habeas proceedings.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  A faulty jury instruction will constitute a violation of due process only where the instruction by itself infects the entire trial to such an extent that the resulting conviction violates due process. *See Hendricks v. Vasquez*, 974 F.2d 1099, 1106 (9th Cir.1992) *citing Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *See Boyde v. California*, 494 U.S. 370, 380 (1990).

United States District Court

For the Northern District of California

1    Petitioner argues that the instruction prevented him from attacking Vargas's

2   credibility for procuring a favorable deal in exchange for his testimony.  Hab. Pet. 6(c).  The

3   purpose of CALJIC 2.11.5 is to discourage the jury from speculating about the

4   prosecution's reasons for not jointly prosecuting all those shown by the evidence to have

5   participated in the charged offenses, and to discourage speculation about the fates of

6   unknown perpetrators.  Resp. Exh. C at 20 (citation omitted).  Under this rationale, the

7   instruction should not be given if the "other person" who may have been involved testifies at

8   trial, because it could prevent a jury from considering evidence of a co-participant's bias.

9   *Id.*  While reasonable minds might differ as to whether it was error to give the instruction,

10  even if there was error, given the standard for judging claims of instructional error, it is clear

11  that in light of all the other instructions it did not infect the entire trial.  *See Hendricks*, 974

12  F.2d at 1106.  The jury was instructed that they were the sole judges of witness credibility

13  and could assign the weight to be given to the testimony of each witness.  Resp. Exh. B10

14  at 1749.  The jury was also instructed regarding witness bias, interest, or other motive.  *Id.*

15  at 1749-50.  Finally, the jury was instructed that Vargas was an accomplice whose

16  testimony should be examined with care and caution in light of all the evidence presented,

17  and subject to the rule requiring corroboration.  *Id.* at 1759.  In view of the trial court's

18  instructions taken as a whole, it is not reasonably likely that the jury applied CALJIC No.

19  2.11.5 to bar consideration of Vargas's motive for testifying.  *See Boyde,* 494 U.S. at 380.

20    The California Court of Appeal's rejection of petitioner's claim of instructional error

21  was not an unreasonable application of clearly established Supreme Court precedent, nor

22  was it  based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).

23  **II.    Street Gang Enhancement**

24    Petitioner claims that there was insufficient evidence to support the criminal street

25  gang enhancement.  Hab. Pet. 6(d). California law imposes additional punishment when a

26  defendant commits a felony for the benefit of, at the direction of, or in association with a

27  criminal street gang.  *See* Cal. Penal Code § 186.22(b)(1).  To establish that a group is a

28  criminal street gang within the meaning of the statute, the prosecution had to prove: (1) the

13

United States District Court
For the Northern District of California

group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated offenses[1]; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. *See People v. Duran,* 97 Cal. App. 4th 1448, 1457 (2002). On counts two through four, the jury found true the allegation that petitioner committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang. Resp. Exh. B11 at 1976-77. In accordance with the jury's finding, the trial court, pursuant to Cal. Penal Code § 186.22(b)(1)(C), imposed ten year sentences on each of the counts to run concurrent to one another. *Id.* at 2019.

On direct appeal petitioner argued that there was insufficient evidence of the second element required for the gang enhancement because the expert failed to identify that a specific crime listed in the statute was one of the group's primary activities. Resp. Exh. C at 22. The California Court of Appeal rejected petitioner's claim, finding that the expert, through his conversations with gang members, his investigation of gang crimes, and his conversations with other officers, could give his opinion that one of the primary activities of petitioner's gang was the commission of crimes enumerated in the statute. *Id.* at 23-24. Specifically, he testified that he investigated assaults and robberies committed by petitioner's gang, both offenses enumerated in the statute, and was familiar with the kind of offenses that relevant gang members consistently and repeatedly commit. *Id* at 24. Testimony at trial indicated that petitioner was an admitted gang member who robbed two teenagers in a park and stole a vehicle in an attempt to get away, in association with and for the benefit of his gang. *Id.* Based on this record, the court concluded that there was sufficient evidence to support the jury's finding that one of the primary activities of petitioner's gang was the commission of one or more statutorily enumerated offenses. *Id.*

A due process claim based on insufficiency of the evidence can only succeed when, viewing all the evidence in the light most favorable to the prosecution, no rational trier of

---

[1]The statute lists thirty-three offenses, including assault, robbery, homicide, and vehicle theft. Section 186.22(e).

United States District Court

For the Northern District of California

fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979). Insufficient evidence claims are reviewed by looking at the elements of the offense under state law. *Id.* at 324 n.16; *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (in determining whether sufficient evidence supports a state law statutory enhancement, federal courts are bound by "a state court's interpretation of state law").

Under California law either prior conduct or acts committed at the time of the charged offenses can be used to establish the "primary activities" element of the gang enhancement. *See People v. Sengpadychith*, 26 Cal. 4th 316, 323 (2001). Sufficient proof of a gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute. *Id.* at 324. Expert opinion testimony based on personal conversations with and investigations of gang members, together with information from colleagues and other law enforcement agencies may also be sufficient. *Id.*

Here the prosecution's expert testified that he had investigated approximately 33 of the crimes enumerated in the gang statute, and that, based on his experience, many of the primary activities of petitioner's gang throughout its fifteen years of operation included the commission of those specific crimes. Resp. Exh. B9 at 1608-09. The expert also testified regarding the criteria used by the police department in determining whether or not someone is a gang member. *Id.* at 1612. The offenses for which petitioner stood accused were all included among the statutorily enumerated offenses in § 186.22. *See* Cal. Penal Code § 186.22(e). Testimony regarding petitioner's charged criminal conduct, combined with the expert's testimony that members of petitioner's gang individually and collectively engaged in the enumerated crimes, are sufficient, and were properly used, to establish the "primary activities" element of the gang enhancement. *See Sengpadychith*, 26 Cal. 4th at 323. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found, beyond a reasonable doubt, that one of the primary activities of petitioner's gang was the commission of a statutorily enumerated offense. Accordingly, the

state court's decision finding that there was sufficient evidence to support the gang

enhancement was not contrary to, or an unreasonable application of, Supreme Court

precedent.  *See* 28 U.S.C. § 2254(d)(1); *Jackson*, 443 U.S. at 324.

### III.     Felony-Murder

Petitioner challenges the constitutionality of the felony murder rule as applied to the

facts of his case.  Hab. Pet. 6(f).  California Penal Code § 189, which establishes the limits

of felony murder, provides that a murder that is committed in the course of a robbery is

felony murder in the first degree.  *See* Cal. Penal Code §189.  The evidence presented at

trial established that petitioner and his co-defendant, Salinas, assaulted and robbed two

teenagers in a park and then stole a minivan in an attempt to evade police arriving at the

scene in response to reports of violence.  Resp. Exh. C at 26.  The record further reflects

that Salinas drove the minivan at a high rate of speed and ignored traffic signals, which led

to his smashing into the victim's car at full speed.  Resp. Exh. B5 at  974-79.  Because the

California Supreme Court summarily denied the petition with no explanation, the court must

conduct an independent review of the record to determine whether the state court decision

denying petitioner's challenge was objectively unreasonable.  *See Delgado*, 223 F.3d at

982.

Petitioner argues that he neither intended nor caused the victim's death, therefore

the twenty-five year to life sentence imposed amounts to cruel and unusual punishment.

Hab. Pet. 6(f).  "[C]alifornia's felony murder rule is not an evidentiary shortcut to finding

malice, but a rule of substantive law establishing a first degree murder penalty for murders

which occurred in the course of committing another felony....[petitioner's] intent, which the

prosecution must still prove, relates to the other felony rather than the murder."  *See

McMillan v. Gomez*, 19 F.3d 465, 470 (9th Cir. 1994).  The California legislature's

determination that the mens rea for robbery-based felony murder is equivalent to the mens

rea for premeditated murder does not violate the Constitution. *See Schad v. Arizona*, 501

U.S. 624, 643-45 (1991).  The Eighth Amendment requires a criminal sentence to be

proportionate to the crime for which the defendant has been convicted.  *See Solem v.*

United States District Court

For the Northern District of California

*Helm*, 463 U.S. 277, 290 (1983).  However, robbery-based felony murder does not violate the Eighth Amendment when the defendant was a major actor in a felony and exhibited a reckless indifference to human life.  *See Tison v. Arizona*, 481 U.S. 137, 158 (1987).

Petitioner is not entitled to habeas relief, as the evidence supports his conviction under a theory of robbery-based felony murder.  Based on the evidence presented at trial, a reasonable jury could have concluded that petitioner had a clear intent to commit the robberies in the park, leading directly to the victim's death as a result of his attempt to flee the crime scene at high speed in a stolen vehicle.  Even though petitioner was only a passenger in the vehicle when it crashed into the victim's car, the record reflects that he was actively involved in the robbery and participated in the vehicle theft in an attempt to get away.  A twenty-five year prison sentence is not disproportionate where petitioner's involvement in the felony that resulted in the victim's death was major and his mental state was one of reckless indifference.  *See e.g. Tison*, 481 U.S. at 158 (finding that the Eighth Amendment does not prohibit the death penalty as disproportionate in the case of a defendant whose participation in a felony that resulted in murder is major and whose mental state is one of reckless indifference); *see also Solem,* 463 U.S. at 290 n.15 (finding that no sentence of imprisonment would be grossly disproportionate to felony murder).  In view of the substantial evidence that petitioner was guilty of robbery-based felony murder and that his actions displayed a reckless disregard for human life, the state court's rejection of his claim of unconstitutionality was not objectively unreasonable.

## IV.    Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is

straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard.  Here, the court finds that two issues presented by petitioner in his petition meet the above standard and accordingly GRANTS the COA as to those issues.  *See generally Miller-El*, 537 U.S. at 322.

The issues are:

(1) whether the trial court violated petitioner's constitutional rights by giving CALJIC 2.11.5, "Unjoined Perpetrators of Same Crime;" and

(2) whether there was insufficient evidence of the "primary activities" element required for the criminal street gang enhancement.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals.  *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A Certificate of Appealability is **GRANTED**.  *See* Rule11(a) of the Rules Governing Section 2254 Cases.

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: March 15, 2013.

_____
PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.10\MADRIL1771.HC.wpd

18